UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE GENERAL CONVENTION OF THE NEW
JERUSALEM IN THE UNITED STATES OF
AMERICA, INC., THE MASSACHUSETTS
ASSOCIATION OF THE NEW JERUSALEM
(SWEDENBORGIAN), and GEORGE CHAPIN,

Plaintiffs,

v.

EDWARD MACKENZIE, THOMAS KENNEDY,
BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED (SWEDENBORGIAN), and
BOSTONVIEW CORPORATION,

Defendants.

C.A. No.

04 CV 10000 WGY

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A MEMORANDUM OF LIS PENDENS AND MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs hereby move to obtain a memorandum of lis pendens as to a $30 million apartment house which is owned by Defendant, Bostonview Corporation ("Bostonview"). The Defendant, Boston Society of the New Jerusalem, Incorporated (Swendenborgian) (the "Church"), owns Bostonview. The Plaintiffs also move to enjoin the Defendants from transferring, encumbering, or modifying apartment house and from transferring or utilizing any other Church assets. As grounds, therefor, the Plaintiffs state that Edward MacKenzie ("MacKenzie"), a convicted drug trafficker and former enforcer for Whitey Bulger, and Thomas Kennedy ("Kennedy"), who, upon information and belief, engaged in fraudulent loan transactions, have wrongfully taken control of the Church. They intend to convert the apartments into condominiums and to retain much of the proceeds for their personal benefit. They have also repeatedly misappropriated Church funds. To preserve their control, they have

also caused the Church to become disaffiliated from its Denomination, Plaintiff, The General Convention of the New Jerusalem in the United States of America, Inc. (the "Denomination"). As a result of the disaffiliation, the Church's by-laws required the apartment house to be transferred to the Denomination to be held in escrow.

## INTRODUCTION

MacKenzie is a convicted cocaine trafficker. He acted as a physically brutal enforcer for Whitey Bulger. Affidavit of George Chapin ("Chapin Aff."), ¶ 8. In a July, 2003 videotaped interview, MacKenzie stated that he lacks any remorse for his criminal activities, which include, for example, savage beatings, severing and eating an individual's finger and trafficking drugs. He also stated that he still maintains the demonic character which permitted him to carry out these actions.[1]

Prior to his videotaped appearance in July, 2003 (and currently), MacKenzie acted as a leader of the Church. Chapin Aff., ¶¶ 15 & 17. Never, however, did he state during his videotaped appearance that the teachings or inspiration of the Church had affected his behavior or remorsefulness in any way. Simply put, they did not. MacKenzie is a criminal. He has infiltrated the Church only to access its resources for his own personal benefit.

He has done so by fraudulently obtaining control of the votes of a majority of Church members, which is needed to carry out many Church actions. He accomplished this by coercing the Church Council into admitting his and Kennedy's friends and family as members who vote as MacKenzie directs. He also controls the mentally unstable Church Pastor who follows MacKenzie's advice. He has arranged for himself and others friendly to him to be elected as officers and trustees of the Church and directors of its wholly-owned company, Bostonview, which owns the $30 million apartment house. He has also caused the Church to disaffiliate itself

---

[1] The Plaintiffs will produce this video to the Court if he or she desires.

from the Denomination when it sought to remove or closely monitor the Church's pastor, who MacKenzie needs to further his plan. Chapin Aff., ¶ 24.

MacKenzie and his associate, Tom Kennedy, have taken these actions to obtain control of the $30 million apartment house and its $1.2 million in annual net revenue.[2] They seek only to profit personally. They have no interest in the Church. Their actions should be enjoined.

## FACTS

Since its creation in 1818, the Church has been affiliated with the Denomination. See Ex. A.[3] Throughout its history, the Church has obtained a variety of benefits from the Denomination such as financial assistance for ministerial salary when needed; itinerant ministerial services when the Church was without a resident pastor; teaching aids and methodologies for child and adult religious education programs; involvement in denominational youth programs; funding for projects of outreach and publication; retirement benefit(s) for minister(s) in the Church's employ; regular communication and information from the network of the Denomination's societies and centers in North America; and voting privileges in the ongoing work of the Denomination. It has used the services of the Denomination to obtain ministers; to obtain the services of trained consultants in the areas of stewardship, board training and process, and outreach programs; and it has relied on Denominational services to assist in establishing interim pastoral positions as needed. Chapin Aff., ¶ 2.

With the assistance of the Denomination, Reverend G. Steven Ellis ("Reverend Ellis") became the Church's Pastor in 1982. He had graduated from the Denomination's post-graduate seminary. As Pastor, he coordinated the religious activities of the Church. Chapin Aff., ¶ 3.

---

[2] The Church created Bostonview in 1963 when it purchased the apartment house. The apartment house is located at 140 Bowdoin Street, Boston, Massachusetts. It contains more than thirty apartments. The Church and its offices are located on the first floor of the apartment house.

[3] The Church's stated purpose is to establish and maintain public worship of the Lord Jesus Christ according to His Holy Word and the teaching of the Church which He has revealed in the theological writings of Emanuel Swedenborg. See Ex. A.

During his pastorship, Reverend Ellis's behavior changed considerably and detrimentally as a result of his becoming, apparently, a manic depressive. At services conducted during the past several years, he would cry. He became difficult to reach by telephone and otherwise. At services, his sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. He also left the Church for extended periods to spend time with his family in Kentucky. Chapin Aff., ¶ 4.

### Kennedy Befriends Reverend Ellis

In 2002, Thomas Kennedy, a new Church member with an unfavorable and apparently undisclosed background, observed Reverend Ellis's mental instability.[4] Kennedy believed that he could take advantage of Reverend Ellis if he befriended him. After befriending Reverend Ellis, Kennedy asked for nomination as president of the Massachusetts New Church Union (the "Union"). The Union is a non-profit corporation which holds the assets of the Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"). Those assets included more than $1 million in cash and two properties located at 79 Newbury Street, Boston, Massachusetts, and in Duxbury, Massachusetts.[5] As President, Kennedy believed that he could siphon assets from that entity. Chapin Aff., ¶ 6.

Reverend Ellis, through his position in the Association, had Kennedy elected a president of the Union. As planned, Kennedy then utilized the position only for his own personal financial benefit. Without authorization or justification, he attempted to transfer approximately $1 million in Union funds to an account over which only he had the power of withdrawal. See Ex. B. The

---

[4] Kennedy has a history of unfavorable, if not criminal, behavior. Upon information and belief, Kennedy had engaged in fraudulent loan transactions. He also no longer maintained his job in the area of finance at the MBTA.

[5] The Association consisted of six churches, which then included the Church.

Union prevented the transfer. Kennedy had also made hundreds of personal long-distance telephone calls at the Union's expense. See Ex. C.

## Kennedy Recruits MacKenzie

Most important is that during his time as President, Kennedy recruited Edward MacKenzie to assist in dissipating the assets of the Union. MacKenzie had been an enforcer for Whitey Bulger in the 1980s. He had been convicted and has served time in prison for trafficking cocaine. Chapin Aff., ¶ 8. MacKenzie has detailed his criminal behavior in a recently published book, "Street Soldier." At an engagement concerning the book, MacKenzie stated that his demonic personality would never change. He stated that he has never felt any remorse for his criminal activities which included savage beatings, eating an individual's finger and other violent activities.

MacKenzie's activities have not stopped. For example, he reportedly swindled an elderly woman out of more than $20,000 in 2001 by claiming that he would locate her son who had disappeared. See Ex. D. He also reportedly received more than $30,000 in fraudulent workers' compensation payments in 2001 based on a fabricated disability. See Ex. E.

MacKenzie's background readily enabled him to assist Kennedy in the attempted depletion of the Union's assets. MacKenzie and Kennedy moved into the Union's property at 79 Newbury Street. They used Union funds to purchase furniture, computers and telephones for their personal use. They also misappropriated as much as $14,000 from the Union. Chapin Aff., ¶ 9.

Ultimately, the Union scheduled a meeting in which it would disclose Kennedy's activities and then dismiss him. Kennedy resigned to avoid the public disclosure of his misdealings during his term as President. Chapin Aff., ¶ 10.

## MacKenzie and Kennedy Take Actions Needed To
## Control The Church And Its $30 Million Apartment House

In or about November and December, 2002, MacKenzie and Kennedy also began to focus on controlling the $30 million apartment house owned by the Church. MacKenzie also recognized that Reverend Ellis's mental instability made him susceptible to control. Accordingly, MacKenzie spent each day at the church and with Reverend Ellis. MacKenzie and Reverend Ellis ate their meals together each day. MacKenzie drove Reverend Ellis wherever he wanted to go. MacKenzie also performed other administrative tasks for the Church. As a result, Reverend Ellis became close to MacKenzie. Reverend Ellis trusted MacKenzie. He followed MacKenzie's advice. Chapin Aff., ¶ 11.

After obtaining Reverend Ellis's trust, MacKenzie then carried out his fraudulent takeover of the Church. Initially, he intimidated members of the Church's Board of Trustees and the Church Council.[6]  For example, he forced the Trustees to fund tuition associated with MacKenzie's daughter's attendance at a private secondary school.  Never had such an expenditure been approved. Only college tuition had been reimbursed. MacKenzie obtained the funding by standing directly behind the Chairman of the Trustees at the time of the vote and indicating that the tuition should be approved. MacKenzie and Kennedy also caused Reverend Ellis to pay them thousands of dollars from the Church's relief fund. Such a practice had never occurred in the past. Chapin Aff., ¶ 12.

Through the above and other activities, MacKenzie quickly communicated that he is a person with whom people should not disagree. He used this fear and intimidation to coerce the Trustees and the Church Council to approve certain items never before approved. MacKenzie's control of Reverend Ellis prevented any objection by him. Chapin Aff., ¶ 13.

[6] The Church's Board of Trustees manages the financial and other activities of the Church. The Church Council controls membership and other activities. Members of both bodies are comprised of Church members. See Ex. A, Art. IX.

One such item concerned the admission of new Church members. The Church requires votes from a majority of the membership to approve various actions. To obtain control over a majority of members, MacKenzie and Kennedy sought to admit as Church members family members and friends. Many of these individuals had never even visited the Church. They had never been confirmed into the Swedenborgian faith as is required by the Church's by-laws. Chapin Aff., ¶ 14. See Ex. A, Art. IV, Sec. 3. Many did not even attend the meeting in which MacKenzie sought to have them elected as Church members. They had no interest in the Church. Despite the foregoing, MacKenzie used fear and intimidation to force the Church Council and the Church Membership to admit these individuals as members. After their admission, he then controlled a majority of the voting members. Chapin Aff., ¶ 14.

MacKenzie then used that majority vote to obtain control of the Church's Board of Trustees. At an annual May meeting of Church members, MacKenzie proposed that he and others be elected as Trustees in place of those nominated by the Nominating Committee, who included Robert Buchanan, Joan Buchanan and John Perry. MacKenzie advised Reverend Ellis that he should favor the removal of Mr. Buchanan, Reverend Ellis's father-in-law, because he hindered Reverend Ellis's leadership of the Church. Reverend Ellis followed MacKenzie's advice. Chapin Aff., ¶ 15.

MacKenzie fixed the outcome of the votes at the May, 2003, meeting. He instructed his and Kennedy's family members and friends how to vote. He caused Reverend Ellis to distribute and endorse an alternate slate of officers, knowing that many of the members would not want to vote against Reverend Ellis's position. They voted as directed. He prevented individuals from speaking in opposition to his nominees. He also extorted the votes of elderly members of the Church. He indicated that not voting in favor of each item would cause them to lose benefits

from the Church or would otherwise be detrimental to them. Many of these individuals also voted in favor of electing MacKenzie, Kennedy and others. They also voted in favor of discharging Robert Buchanan, Joan Buchanan and John Perry who had served as Trustees for numerous years. Chapin Aff., ¶ 16.

At the May, 2003, meeting, MacKenzie also used similar measures to cause him to be elected as Treasurer. MacKenzie became Treasurer only to have direct access to Church funds. Chapin Aff., ¶ 17.

The positions as Trustee and Treasurer could not become effective until September 1, 2003. Not surprisingly, on September 2, 2003, he and Kennedy approached the Bank seeking payment of $10,000 in checks payable to them. Because the Bank did not understand that MacKenzie acted as Treasurer, it refused to cash the checks. See Ex. F. MacKenzie and Kennedy later obtained payment of $10,000 from the Church. No justification existed for the payment. Chapin Aff., ¶ 18.

MacKenzie scheduled another meeting to be held on September 21, 2003, as to voting for the directors of Bostonview, the entity which owned the apartment house. He again arranged for his and Kennedy's family members and friends to vote for the removal of existing Directors and the appointment of MacKenzie, Kennedy and others as new directors. He extorted the votes of elderly members as well. Chapin Aff., ¶ 19. In furtherance of their plan, MacKenzie and Kennedy caused Edwards & Angell, LLP to forward a letter to the property manager on September 23, 2003, setting forth the members of the board of directors. See Ex. G.

He also recommended the expulsion of Robert and Joan Buchanan as members of the Church. He also sought the expulsion of long-standing Church Members based on the fabricated contention that they could not regularly participate in Church activities because they lived too far

from the Church. Chapin Aff., ¶ 20. Such a measure is difficult to understand. The friends and family members he had admitted as members played no role in the Church and visited only when votes were needed at Church meetings. MacKenzie sought the expulsion of the long-standing members only to preclude them from interfering with his plan to control the Church and its assets.

### The Denomination Investigates Reverend Ellis

As a result of MacKenzie's actions up to May, 2003, several Church Members asked the Denomination to conduct an investigation as to the practices of Reverend Ellis. See Ex. H. As part of this investigation, the Denomination conducted an interview of Reverend Ellis. MacKenzie and Kennedy attended the interview. They acted as spokesmen for Reverend Ellis. They limited his responses and controlled the interview. Chapin Aff., ¶ 21.

After completion of the investigation, and, upon information and belief, the review of all activities occurring after May, 2003, the Denomination presented Reverend Ellis with three options: (1) he could be closely supervised for six months; (2) he could be suspended for one year; or (3) he could have his credentials as a Swedenborgian minister revoked. MacKenzie could not accept any of the options as to Reverend Ellis. To do so would require him to lose control of Reverend Ellis, whom he needed. Chapin Aff., ¶ 22.

At or about this time, the Association's Executive Committee also failed to recognize the expulsion of members by MacKenzie's Church. See Ex. I. The Association also intended not to recognize newly-admitted members to the Church. Those actions would also be difficult for MacKenzie and Kennedy to manage. He and Kennedy needed these votes to control the majority vote of the Membership. They did not need an investigation as to whether the memberships were valid, which they were not. Accordingly, MacKenzie and Kennedy directed Edwards & Angell, LLP to send two letters to the Association in an attempt to frustrate their resolution.

See Exs. J & K. The first letter attempted to avoid the production of information. The second letter attempted to follow the language of the resolution in an effort to avoid an investigation as to the expulsion of members. Thereafter, MacKenzie and Kennedy advised Reverend Ellis that the Church should disaffiliate itself from the Denomination and the Association. Reverend Ellis followed MacKenzie's advice. Chapin Aff., ¶ 23.

### The Church Disaffiliates Itself From the Denomination

MacKenzie and Kennedy forced the Church Membership to vote in favor of disaffiliation from the Denomination. MacKenzie's and Kennedy's family members and friends voted as directed. MacKenzie and Kennedy then misrepresented to the remaining members the reason for the vote. They did not disclose that continued affiliation with the Denomination would foil their plan to continue to control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination. Many of the remaining Church members then voted in favor of disaffiliation. Chapin Aff., ¶ 24.

By letters dated October 26, 2003 to the Denomination and the Association, the Church communicated its disassociation to the Denomination and the Association. Chapin Aff., ¶ 25; Exs. L & M. The Church had not amended its by-laws at this time. They provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

Ex. A, Art. X, Sec. 3 (emphasis added).

Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, should have been transferred to the Denomination. Chapin Aff., ¶ 26.

### MacKenzie and Kennedy Now Operate Businesses From Church Offices

Since obtaining control of the Church, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church. Operating the businesses from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other expenses that they would otherwise incur operating the businesses from other locations. Chapin Aff., ¶ 27.

MacKenzie and Kennedy have also caused John Doyle to join the Church. He is a real estate "broker" who, upon information and belief, had previously worked for Whitey Bulger. He will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums. Chapin Aff., ¶ 28.

### ARGUMENT

I.    **The Denomination Is Entitled to a Memorandum of <u>Lis Pendens</u> Concerning the Apartment House.**

Mass. Gen. Laws ch. 184, § 15 provides that:

> Upon motion of any party, a justice of the court before which the action is pending <u>shall</u>, if the subject matter of the action constitutes a claim of a right to title to real property or the use and occupation thereof or the buildings thereon, make a finding to that effect and endorse said finding upon said memorandum. [Emphasis added.]

Thus, the standard for an order approving the recording of a Memorandum of <u>Lis Pendens</u> requires only that two elements be shown: (1) that suit has been brought by Plaintiff against Defendants, and (2) that the suit "affects the title to real property or the use and

occupation thereof or the buildings thereof." <u>Sutherland v. Aolean Dev. Corp.</u>, 502 N.E.2d 528, 531 (Mass. 1987).

To be entitled to a Memorandum of <u>Lis Pendens</u>, plaintiff need not show that it has a substantial likelihood of success of prevailing on the merits against Defendants. <u>Sutherland</u>, 502 N.E.2d at 531. In fact, in deciding whether to endorse a memorandum of <u>lis pendens</u> to make it recordable, the court need not even determine that the complaint would survive a motion to dismiss. <u>Id.</u> The Court needs only to determine if the plaintiff's claim affects title of real property or the use and occupation thereof or the buildings thereon. <u>Id.</u>

In the present case, the Denomination's has filed suit. The Denomination is also seeking title to the apartment house pursuant to the Church's by-laws. Thus, this dispute clearly involves a claim with regard to the title or use and occupation of real property. <u>See</u> <u>Sutherland</u>, 502 N.E.2d at 531 (<u>lis pendens</u> appropriate where claim concerns interest in real estate); <u>see also</u> <u>In re Thomas, Inc.</u>, 37 B.R. 387, 392 (D. Mass. Bankr. 1984) (<u>lis pendens</u> appropriate where claim sought imposition of trust on property). Thus, the Court should approve a memorandum of <u>lis pendens</u>.

## II.    Defendants Will Dissipate the Church's and Bostonview's Assets Unless Preliminary Enjoined From Doing So.

In determining whether to approve an application for a preliminary injunction, a court must consider: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) a balancing of the relevant equities, <u>i.e.</u>, the hardship of the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect, if any, of the ruling on the public interest. <u>See</u> <u>I.P. Lund Trading APS Kroin, Inc. v. Kohler, Co.</u>, 163 F.3d 27, 33 (1st Cir. 1998); <u>Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996). To succeed, a moving party must demonstrate either actual

# 1682366_v1

present harm or a likely danger of direct injury in the future. See Comfort v. Lynn Sch. Comm.,
150 F. Supp. 2d 285, 295 (D. Mass. 2001). The moving party has the burden of demonstrating
that injunctive relief is appropriate. See I.P. Lund, 163 F.3d at 33.

A.   **There Is a Likelihood That Plaintiffs Will Succeed On All Claims Including Those That Allege (1) That the Denomination Is Entitled to Hold in Escrow the Apartment House and (2) That MacKenzie and Kennedy Breached Their Fiduciary Duties, Violated RICO, and Committed Fraud.**

To prove a likelihood of success, the Plaintiffs are not required to demonstrate that they
will win. Rather, the Court's analysis should be concerned with probable outcomes should the
Complaint be tried. See A.W. Chesterton Co., Inc. v. Chesterton, 907 F. Supp. 19, 22 (D. Mass.
1995); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991).

1.   **There Is a Likelihood That the Church's Disaffiliation Required It to Transfer Its Assets to the Denomination.[7]**

"Civil courts may permissibly decide church property disputes 'so long as it involves no
consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of
faither." Weaver v. Wood, No. 937320, 1994 WL 879566, at *4 (Mass. Super. Sept. 14, 1994)
(citing Jones v. Wolf, 443 U.S. 595, 602 (1979)) ("judicial intervention is permissible where the
dispute involves the interpretation of by-laws as they constitute a contract between the church
and its members").

Courts may resolve disputes which center on a breach of the church by-laws, not any
church doctrine. Id. Thus, the Court can resolve this issue by relying on objective, well-
established "neutral principles of law." See Weaver, 1994 WL 879566, at *6 (court could
address ultra vires conduct of defendants in their dealings with church property because "neutral
principles of law" could be applied to the dispute because the "by-law does not contain any

---

[7] If successful as to this claim, the Plaintiffs will not seek to have the votes of the Church declared to be void and
without effect. To the extend that the Plaintiffs are unsuccessful, they will seek to demonstrate that such votes are
void and without effect.

reference to religious doctrine, policy and practice."); <u>Antioch Temple, Inc. v. Parekh</u>, 422 N.E.2d 1337, 1345 (Mass. 1981) ("Under the 'neutral principles of law' analysis, as long as a State court's resolution of a church property dispute involves no inquiry into religious doctrine, the court may examine such sources as . . . the constitutions and by-laws of the religious organizations involved, especially in so far as they pertain to the ownership and control of church property . . . ."); <u>Lily of the Valley Baptist Church, Inc. v. Josey</u>, No. 99-P-576, 2002 WL 31445129, at *1 (Mass. App. Ct. Oct. 30, 2002) (holding that the court could resolve dispute over church by-laws).[8]

> Prior to its withdrawal from the Denomination, the Church's by-laws provided:
>
> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> <u>These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church</u> within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

<u>See</u> Ex. A (emphasis added).

This provision specifically provides that the Church's assets will be held in escrow until "the establishment of <u>another</u> General Convention of the New Jerusalem (Swedenborgian) Church" in Boston. Thus, any disaffiliation of the Church from the General Convention of the New Jerusalem (<u>i.e.</u>, the Denomination) triggers the applicability of this provision.

In the present case, the Church disaffiliated itself while the current by-laws were effective. Thus, at the time of disaffiliation all Church assets should have passed to the

---

[8] Courts considering this issue either decide it under the "neutral principles of law" approach or they look to the structure of the church, namely whether its is "hierarchical" or "congregational." A congregational church is one that is self-governing. <u>Antioch Temple, Inc. v. Parekh</u>, 422 N.E.2d 1337, 1341 (Mass. 1981). Courts may resolve disputes as to congregational churches. <u>Id.</u> Thus, even if this Court decides not to apply the neutral principles of law approach, the Court may address the present disputes because the Church is congregational.

Denomination. The Denomination is now entitled to hold those assets in escrow until the creation of a new Church that is affiliated with the Denomination. Thus, the Denomination is entitled to the apartment house and its income (as well as all other assets of the Church).

### 2. MacKenzie and Kennedy Have Likely Breached Their Fiduciary Duties to the Church and Bostonview.

There is no question as to the merits of the Plaintiffs' breach of fiduciary count against MacKenzie and Kennedy. It is well settled law that officers and directors of a corporation owe fiduciary duties to that corporation. Demoulas v. Demoulas Supermarkets, Inc., 677 N.E.2d 159, 179 (Mass. 1997). "They owe to the corporation and its shareholders a duty of care and a 'paramount duty of loyalty.'" Henderson v. Axiam, Inc., 1999 WL 33587312, at *49 (Mass. Super. June 22, 1999), aff'd, 797 N.E.2d 502 (Mass. App. Ct. Oct 16, 2003) (citing Spiegel v. Beacon Participations, Inc., 8 N.E.2d 895, 904-05 (Mass. 1937) ("They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation ... They cannot be permitted to serve two masters whose interests are antagonistic.")).

Furthermore, "[w]hen a director or officer removes or diverts corporate assets for which the corporation receives no benefit, then the director or officer breaches the duty of loyalty and is liable for waste of corporate assets." Henderson, No. 962572D, 1999 WL 33587312, at *53 (citing Coggins v. New England Patriots Football Club, Inc., 492 N.E.2d 1112, 1120 (Mass. 1986) (use of corporate assets for personal benefit is a wrong to the corporation)); Michelson v. Duncan, 407 A.2d 211, 217 (Del. Super. 1979) ("The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes")).

In Henderson, the defendant wasted corporate assets by using corporate funds to finance his defense of the shareholder dispute. The court in Henderson explains:

The financing of the defense costs in this action by Axiam serves no corporate purpose of Axiam; nor does the financing of the Holts' personal defense and counterclaims against certain plaintiffs. Rather the sole purpose of such actions was to perpetuate the Holts' control. Further, the Holts' use of corporate monies for personal expenses served no valid corporate purpose and was improper. Accordingly, the shareholders, on behalf of the corporation, are entitled to recover these funds from the Holts.

Henderson, 1999 WL 33587312, at *53-54.[9]

MacKenzie and Kennedy, as trustees and officers of the Church and directors of Bostonview owed and breached fiduciary duties in numerous ways. They fraudulently represented the need to have their friends and family members join as members of the Church. They never disclosed that these members would vote as directed by MacKenzie and Kennedy or were needed to obtain control of a majority of the Church members.

Their commission of staged voting as to the election of directors of Bostonview, the expulsion of Members, and the disaffiliation of the Church from the Denomination also constitutes breaches of fiduciary duties. MacKenzie and Kennedy furthered these efforts only for their own personal benefit, and not the benefit of the Church or Bostonview. Through these votes, they obtained control of Bostonview and the $30 million apartment house. They expelled Members to preclude interference with their plan to control the Church and its apartment house. They chose to disaffiliate the Church from the Denomination only because affiliation would frustrate their plan to obtain control.

In addition, MacKenzie and Kennedy have taken money from the Church. They have received thousands of dollars from the Church's Relief Fund. MacKenzie has received

---

[9] The business judgment rule does not apply here. Normally, the business judgment rule "entitles a director to a presumption that his or her actions were in the best interests of the corporation." Henderson, 1999 WL 33587312, at *50. However, where the plaintiff alleges a self-dealing transactions, as is the case here, the business judgment rule has no application. Id. (citing Starr v. Fordham, 648 N.E.2d 1261, 1266 (Mass. 1995); Johnson v. Witkowski, 573 N.E.2d 513, 522 (Mass. App. Ct. 1991), rev. denied, 581 N.E.2d 481 (Mass. 1991).

reimbursement for secondary school tuition. MacKenzie and Kennedy did not do anything to justify these payments.

In addition, because MacKenzie's and Kennedy's breaches of fiduciary duty have caused harm to the Church and Bostonview[10] they are not entitled to receive any funds from these entities to fund defense costs or other related expenses. Henderson, 1999 WL 33587312, at *54. They must bear those expenses personally.[11]

**3.    MacKenzie and Kennedy Have Likely Committed Fraud in Connection With the Admittance of the New Members and Their Operation of the Church.**

Specific elements of a common-law action for fraud are that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon and that the plaintiff relief upon the representation as true and acted upon it to his damage. Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975); Barrett Assocs., Inc. v. Aronson, 190 N.E.2d 867, 868 (Mass. 1963). A fraud is any artifice whereby he who practices it gains, or attempts to gain, some undue advantage to himself, or to work some wrong or to do some injury to another, by means of which he knows to be false, or of an act which he knows to be against right or in violation of some positive duty. Commonwealth v. O'Brien, 26 N.E.2d 235, 238 (Mass. 1940).

In the present case, MacKenzie and Kennedy likely perpetrated fraud on numerous occasions. They misrepresented the reasons for admitting friends and family members as members of the Church. They sought the admission of these individuals only to obtain control

---

[10] Plaintiffs understand that Edwards & Angell, LLP currently represent the Church and Bostonview. See Ex. G. That representation creates a conflict of interest which precludes Edwards & Angell from representing MacKenzie and Kennedy. Rowen v. LeMars Mut. Ins. Co., 230 N.W.2d 905, 914-15 (Iowa 1975) (a conflict of interests exists "when the same law firm attempts to represent the nominal corporate defendant in a derivative action while at the same time representing . . . corporate insiders accused of wrongdoing"); see also Murphy v. Washington Am. League Baseball Club, Inc., 324 F.2d 394, 398 (D.C. Cir. 1963) (in derivative suit challenging salary increases voted by board of directors, corporation and individual defendants require separate counsel).

[11] To the extent that they prevail in this litigation they could explore seeking reimbursement from the Church or Bostonview.

over a majority of the membership. They also misrepresented the reasons for disaffiliating the

Church from the Denomination. MacKenzie and Kennedy required disaffiliation only to protect

their plan to control the Church and the apartment house.

### 4. MacKenzie and Kennedy Have Likely Violated RICO Through Their Activities Concerning the Church and Bostonview.

To establish violation of 18 U.S.C. § 1962(b) (2000),[12] the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), a plaintiff must show that he or she was harmed by reason

of the defendants' acquisition or maintenance of control of an enterprise through a pattern of

racketeering activity. Campagnie de Reassurance D'Ile de France v. New England Reinsurance

Corp., 57 F.3d 56, 92 (1st Cir. 1995). Racketeering activity, as defined by the RICO statute,

includes extortion or threat of extortion, as well as mail and wire fraud. 18 U.S.C. § 1961

(2000).

To establish violation of 18 U.S.C. § 1962(c),[13] a plaintiff must prove "(1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity." Doyle v. Hasbro, Inc., 103 F.3d

186, 190 (1st Cir. 1996) (internal quotation marks omitted). In addition, the plaintiff must prove

the existence of a person, separate from the enterprise, who conducts or participates in the

pattern of racketeering activity. 18 U.S.C. § 1962(c); Doyle, 103 F.3d at 190.

Repeated and continued use of extortion tactics and mail fraud to obtain and control the

voting majority of the Church and Bostonview constitute a pattern of related and continuous acts

conducted with the purpose of appropriating the assets of the Church and Bostonview for their

own personal gain. See Efron v. Embassy Suites, Inc., 223 F.3d 12, 15 (1st Cir. 2000) ("By

---

[12] 18 U.S.C. § 1962(b) provides that "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire and maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

[13] 18 U.S.C. § 1962(c) provides that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

statute, the 'pattern' element requires a plaintiff to show at least two predicate acts of 'racketeering activity' .... Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."). The existence of the threat that these activities will continue indefinitely strengthens the position that such actions constitute a pattern of racketeering activity. See Efron, 223 F.3d at 16 (stating that a requirement of pattern can be satisfied by "a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future.") (internal quotation marks omitted).

To establish a RICO conspiracy under 18 U.S.C. § 1962(d),[14] the plaintiff must show: "(1) the existence of an enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses." In re: Lupron Marketing and Sales Practices Litigation, 295 F. Supp. 2d 148, 176 (D. Mass. 2003).

MacKenzie and Kennedy have likely violated RICO sections (b), (c) and (d). MacKenzie and Kennedy engaged in a pattern of racketeering activity through the affairs of the Church by systematically and fraudulently obtaining control of the votes of the majority of the Church members through extortion or threat of extortion.[15] They extorted the votes of the elderly members of the Church to control the outcome of the May 2003 meeting. Through those actions

---

[14] 18 U.S.C. § 1962(d) states that "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[15] In order to prove a predicate act of extortion under 18 U.S.C. § 1961, a plaintiff must demonstrate that the defendant obtained property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear. See 18 U.S.C. § 1951(b)(2) (2000) (Hobbs Act).

they became members of the Board of Trustees. In addition, they extorted votes of elderly Church members using similar tactics to elect MacKenzie as treasurer of the Church and to elect him, Kennedy and others to the board of directors of Bostonview. They also forced the Church membership to vote in favor of disaffiliation from the Denomination through fraudulent misrepresentations; ran their private business out of the Church's offices and misappropriated the resources of the Church to that end; and intend to use their position within Bostonview to wrongfully sell real estate that once belonged to the Church and now rightfully belongs to the Denomination.

In addition to extortion tactics, MacKenzie and Kennedy committed five instances of mail fraud in furtherance of their scheme.[16] They directed Edwards & Angell, LLP to mail correspondence on September 23, 2003, concerning their election as new directors of Bostonview. They directed Edwards & Angell, LLP to forward correspondence on September 29, 2003, to frustrate a possible investigation into their expulsion of Church members. On October 26, 2003, they caused the Church to forward correspondence to the Denomination and Association concerning the Church's disaffiliation from the Denomination.

Through this racketeering activity, MacKenzie and Kennedy have obtained control, and diminished the assets, of the Church and Bostonview. MacKenzie and Kennedy also knowingly conspired to commit these racketeering activities.[17] Therefore, for the above reasons, MacKenzie and Kennedy have likely committed a violation of RICO sections (b), (c) and (d).

---

[16] Mail fraud is a predicate act. 18 U.S.C. § 1961. 18 U.S.C. § 1341 provides that mail fraud occurs upon the mailing of information to further a fraudulent scheme. MacKenzie and Kennedy caused the letters sent on September 23, 2003, September 29, 2003 and October 26, 2003 to further their fraudulent scheme to control the Church and its assets.

[17] Under 18 U.S.C. § 1962(d), a conspiracy occurs when a defendant agrees with one or more conspirators to participate in a violation of §1962(a), (b), or (c). See Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994) ("All that is necessary to prove this element of the RICO conspiracy, against a particular defendant, is to prove that he or she agreed with one or more co-conspirators to participate in the conspiracy. Moreover, it is not necessary for the conspirational agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved."). Here, MacKenzie and Kennedy's