UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN), and GEORGE CHAPIN, <br><br> Plaintiffs, <br><br> v. <br><br> EDWARD MACKENZIE, THOMAS KENNEDY, BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED (SWEDENBORGIAN), and BOSTONVIEW CORPORATION, <br><br> Defendants. | C.A. No. <br><br> 04 cv 10399 WGY |

## AFFIDAVIT OF GEORGE CHAPIN

I, George Chapin, hereby depose and say:

1. I am a member of the Boston Society of the New Jerusalem, Incorporated (Swedenborgian).

2. During my tenure as a member, the Church had obtained a variety of benefits from its Denomination, The General Convention of the New Jerusalem in the United States of America, Inc., such as financial assistance for ministerial salary when needed; itinerant ministerial services when the Church was without a resident pastor; teaching aids and methodologies for child and adult religious education programs; involvement in denominational youth programs; funding for projects of outreach and publication; retirement benefit(s) for minister(s) in the Church's employ; regular communication and information from the network of the Denomination's societies and centers in North America; voting privileges in the ongoing

# 1718072_v1

work of the Denomination. It has used the services of the Denomination to obtain ministers; to obtain the services of trained consultants in the areas of stewardship, board training and process, and outreach programs; and it has relied on Denominational services to assist in establishing interim pastoral positions as needed.

3. With the assistance of the Denomination, Reverend G. Steven Ellis became the Church's Pastor in 1982. He had graduated from the Denomination's post-graduate seminary. As Pastor, he coordinated the religious activities of the Church.

4. During his pastorship, Reverend Ellis's behavior changed considerably and detrimentally as a result of him becoming apparently a manic depressive. At services conducted during the past several years, he would cry. He became difficult to reach by telephone and otherwise. At services, his sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. He also left the Church for extended periods to spend time with his family in Kentucky.

5. In 2002, Thomas Kennedy, a new Church member, observed Reverend Ellis's mental instability. I understand that Kennedy has a history of unfavorable, if not criminal, behavior. Upon information and belief, Kennedy had engaged in fraudulent loan transactions. He also no longer worked for the MBTA at his job concerning finance.

6. Upon information and belief, Kennedy believed that he could take advantage of Reverend Ellis if he befriended him. After befriending Reverend Ellis, Kennedy asked for nomination as president of the Massachusetts New Church Union. The Union is a non-profit corporation which holds the assets of the Massachusetts Association of the New Jerusalem

(Swedenborgian). Those assets included more than $1 million in cash and two properties located at 79 Newbury Street, Boston, Massachusetts, and in Duxbury, Massachusetts.

7. Reverend Ellis, through his position in the Association, had Kennedy elected a president of the Union. As planned, Kennedy then utilized the position only for his own personal financial benefit. Without authorization or justification, he attempted to transfer approximately $1 million in Union funds to an account over which only he had the power of withdrawal. The Bank notified the Union of this attempt. The Union prevented the transfer. Kennedy had also made hundreds of personal long-distance telephone calls at the Union's expense.

8. Most important is that during his time as President, Kennedy recruited Edward MacKenzie to assist in dissipating the assets of the Union. MacKenzie had been an enforcer for Whitey Bulger in the 1980s. He had been convicted and has served time in prison for trafficking cocaine. MacKenzie has detailed his criminal behavior in a recently published book, "Street Soldier."

9. Upon information and belief, MacKenzie and Kennedy moved into the Union's property at 79 Newbury Street. Upon information and belief, they used Union funds to purchase furniture, computers and telephones for their personal use. Upon information and belief, they also misappropriated as much as $14,000 from the Union.

10. Ultimately, the Union scheduled a meeting in which it would disclose Kennedy's activities and then dismiss him. Kennedy resigned to avoid the public disclosure of his misdealings during his term as President.

11. In or about November and December, 2002, I understand that MacKenzie and Kennedy also began to focus on controlling the $30 million apartment house owned by the

Church. Upon information and belief, MacKenzie also recognized that Reverend Ellis's mental instability made him susceptible to control. Accordingly, MacKenzie spent each day at the church and with Reverend Ellis. MacKenzie and Reverend Ellis ate meals together. MacKenzie drove Reverend Ellis wherever he wanted to go. MacKenzie also performed other administrative tasks for the Church. As a result, Reverend Ellis became close to MacKenzie. Reverend Ellis trusted MacKenzie. He followed MacKenzie's advice.

12. After obtaining Reverend Ellis's trust, MacKenzie then carried out his fraudulent takeover of the Church. Initially, he intimidated members of the Church's Board of Trustees and the Church Council. For example, he forced the Trustees to fund tuition associated with MacKenzie's daughter's attendance at a private secondary school. Never had such an expenditure been approved. Only college tuition had been reimbursed. MacKenzie obtained the funding by standing directly behind the Chairman of the Trustees at the time of the vote and indicating that the tuition should be approved. MacKenzie and Kennedy also caused Reverend Ellis to pay them thousands of dollars from the Church's relief fund. Such a practice had never occurred in the past.

13. Through the above and other activities, MacKenzie quickly communicated that he is a person with whom people should not disagree. He used this fear and intimidation to coerce the Trustees and the Church Council to approve certain items never before approved. MacKenzie's control of Reverend Ellis prevented any objection by him.

14. One such item concerned the admission of new Church members. The Church requires votes from a majority of the membership to approve various actions. MacKenzie and Kennedy sought to admit as Church members family members and friends. Many of these

individuals had never even visited the Church. They had never been confirmed into the Swedenborgian faith as is required by the Church's by-laws. Many did not even attend the meeting in which MacKenzie sought to have them elected as Church members. They had no interest in the Church. Despite the foregoing, MacKenzie used fear and intimidation to force the Church Council to admit these individuals as members. After their admission, he then controlled a majority of the voting members.

15. MacKenzie then used the majority vote to obtain control of the Church's Board of Trustees. At an annual May meeting of Church members, MacKenzie proposed that he and others be elected as Trustees in place of others, who included Bobby Buchahan and John Perry. MacKenzie advised Reverend Ellis that he should favor the removal of Mr. Buchanan, Reverend Ellis's father-in-law, because he hindered Reverend Ellis's leadership of the Church. Reverend Ellis followed MacKenzie's advice.

16. MacKenzie fixed the outcome of the votes at the May, 2003 meeting. He instructed his and Kennedy's family members and friends how to vote. They voted as directed. He prevented individuals from speaking in opposition to his positions. He also extorted the votes of elderly members of the Church. He indicated that not voting in favor of each item would cause them to lose benefits from the Church or would otherwise be detrimental to them. Many of these individuals also voted in favor of electing MacKenzie, Kennedy and others. They also voted in favor of discharging Bobby Buchanan and John Perry who had served as Trustees for numerous years.

17. At the May, 2003 meeting, MacKenzie also used similar measures to cause him to be elected as Treasurer. MacKenzie became Treasurer only to have direct access to Church funds.

18. Any new position as Trustee and Treasurer could not become effective until September 1, 2003. On September 2, 2003, MacKenzie and Kennedy approached the Bank seeking payment of, upon information and belief, $10,000 in checks payable to them. Because the Bank did not understand that MacKenzie acted as Treasurer it refused to cash the checks. Upon information and belief, MacKenzie and Kennedy later obtained payment of $10,000 from the Church. No justification existed for the payment.

19. Later in September, 2003, MacKenzie scheduled another meeting to be held as to voting for the directors of Bostonview, the entity which owned the apartment house. He again arranged for his and Kennedy's family members and friends to vote for the removal of existing Directors and the appointment of MacKenzie, Kennedy and others as new directors. He extorted the votes of elderly members as well.

20. He also previously recommended the expulsion of Bobby Buchanan as President of the Church. He also sought the expulsion of long-standing Church Members based on the fabricated contention that they could not regularly participate in Church activities because they lived too far from the Church.

21. In May, 2003, several Members asked the Denomination to conduct an investigation as to the practices of Reverend Ellis. As part of this investigation, the Denomination conducted an interview of Reverend Ellis. I understand that MacKenzie and

Kennedy attended the interview. They acted as spokesmen for Reverend Ellis. They limited his responses and controlled the interview.

22. After the investigation, and despite MacKenzie's and Kennedy's interference, the Denomination presented Reverend Ellis with three options: (1) he could be closely supervised for six months; (2) he could be suspended for one year; or (3) he could have his credentials as a Swedenborgian minister revoked. MacKenzie could not accept any of the options as to Reverend Ellis. To do so would require him to lose control of Reverend Ellis, whom he needed.

23. At or about this time, the Association's Executive Committee also failed to recognize the expulsion of members by MacKenzie's Church. The Association also intended not to recognize newly-admitted members to the Church. Those actions would be unacceptable to MacKenzie and Kennedy. They wished to control these votes to ensure that they controlled the majority vote of the membership. Accordingly, MacKenzie advised Reverend Ellis that the Church should disaffiliate itself from the Denomination. Reverend Ellis followed MacKenzie's advice.

24. MacKenzie and Kennedy forced the Church Membership to vote in favor of disaffiliation from the Denomination. MacKenzie's and Kennedy's family members and friends voted as directed. MacKenzie and Kennedy then misrepresented to the remaining members the reason for the vote. They did not disclose that affiliation with the Denomination would foil their plan to continue to control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination. Many of the remaining Church members then voted in favor of disaffiliation.

25. By letters dated October 26, 2003 to the Denomination and the Association, the Church communicated its disassociation to the Denomination and the Association. True and accurate copies of those letters are attached as Exhibits A and B. The Church had not amended its by-laws at this time. They provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

See Ex. C (emphasis added). A true and accurate copy of the by-laws is attached as Exhibit C.

26. Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, passed to the Denomination no later than October 26, 2003.

27. Since obtaining control of the Church, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church. Operating the businesses from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other expenses that they would otherwise incur operating the businesses from other locations.

28. MacKenzie and Kennedy have also caused John Doyle to join the Church. He is a real estate "broker" who, upon information and belief, had previously worked for Whitey Bulger. He will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums.

9

Signed under the penalties of perjury this __20__ day of February, 2004.

_____
George Chapin